UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
                                                          :
In re:                                                    :
        JAR 259 FOOD CORP.,                         :   Case No. 22-40304 (JMM)
                                                          :
                Debtor.                       :   Chapter 11
                                                          :
----------------------------------------------------------. X
                                                          :
KULJIT KAUR AND AMANDEEP SINGH,                           :
                                                          :   **MEMORANDUM DECISION AND**
                Appellants,                 :   **ORDER**
                                                          :
        - against -                                 :   22-cv-6270 (BMC)
                                                          :
LCF GROUP, INC. a/k/a Last Chance Funding                 :
Group, Inc.,                                              :
                                                          :
                Appellee.                   :
                                                          :
----------------------------------------------------------X

**COGAN**, District Judge.

    At issue in this appeal is whether the Bankruptcy Court abused its discretion in converting this case from Chapter 11 to Chapter 7. Appellants, the owners and former managers of the Debtor, contend the Bankruptcy Court failed to: (1) address outstanding discovery disputes regarding discovery that was material to the conversion motion, (2) made erroneous or unsupported findings of fact, and (3) failed to address the unusual circumstances that made conversion inappropriate.

    In converting the case and appointing a Chapter 7 Trustee, Bankruptcy Judge Mazer-Marino made clear that she did not trust Appellants to reorganize this business. She noted that the Debtor was woefully deficient in submitting schedules of its assets and claims and failing to disclose substantial insider payments, compelling the conclusion that it either didn't know what

was happening in its own business or that it was using its status as debtor-in-possession to obscure insider payments and/or manufacture Subchapter V eligibility. The Bankruptcy Court articulated numerous, fact-based reasons for lacking confidence in Appellants' ability to successfully manage the estate, pursue litigation, and confirm a plan. By converting to Chapter 7, the Bankruptcy Court ensured that an independent and dispassionate fiduciary would oversee the liquidation. There was no abuse of discretion in doing so.

Accordingly, the Order of the Bankruptcy Court is affirmed.

## BACKGROUND

Since 2015, the Debtor, Jar 259 Food Corp., operated a grocery store in Queens. Prior to the petition date, it employed about forty-six individuals, which included union employees. Appellants were the owners and principals of the Debtor and owned various other operating and non-operating affiliates. As a result of the COVID-19 pandemic and competition from big-box grocery stores, the Debtor ran into significant financial difficulties. In early 2020, it entered into an operating agreement with Key Food, under which Key Food agreed to help run the Debtor's store. Even so, the Debtor continued to see a steady decline in profitability, and on February 14, 2022, Key Food gave notice of its intent to terminate its operating agreement with the Debtor. That ended the Debtor's ability to stay in business. On February 18, 2022, the Debtor commenced its bankruptcy case by filing a voluntary petition under Subchapter V of Chapter 11 of the Bankruptcy Code. Subchapter V is available to small businesses that have less than $7.5 million in debt and is intended to streamline processes and reduce costs. See 11 U.S.C. § 1181 *et seq*.

The Debtor undertook strange financing arrangements prior to closing its doors. The amended statement of financial affairs reveals ninety-day transfers to thirty-one "merchant cash

advance companies" or MCAs, which are last resort, high-interest lenders. Indeed, the name of the Appellee, one of the many MCAs, is LCF Group, Inc., aptly doing business as "Last Chance Funding." This financing was structured such that the MCAs purported to buy future receivables in exchange for an immediate cash advance. The Debtor had roughly thirty-seven agreements with MCAs within six months of the filing date through which it sold, collectively, 90% of its receivables for roughly $9 million. The Debtor also obtained a $2 million SBA loan shortly before the filing date. That loan was not reported on the Debtor's original bankruptcy schedules, and most of the money from that loan ($1.5 million) was transferred directly to Appellant Singh's father.

From almost the moment the Chapter 11 case was filed, the blame game began. LCF, taking the lead among the MCAs, moved for Rule 2004 discovery from the Debtor, contending the Debtor had overstated its receivables in order to get advances from the MCAs. LCF also said it had "reason to believe that the Debtor may have not disclosed transactions with its Affiliates and may have underreported the Debtor's assets" and raised the possibility that the "Debtor made voidable transfers to the Affiliates or to family members or other entities that [Appellant] Singh operated . . . in order to shelter assets from this bankruptcy proceeding." Shortly thereafter, the Debtor initiated an adversary proceeding against LCF, alleging it engaged in fraud and conspiracy to evade applicable usury laws. Specifically, the Debtor claimed its financing agreement with LCF was not a true sale of receivables, but a disguised loan which, when so recharacterized, was usurious and therefore the money LCF advanced to the Debtor did not have to be repaid. Similar adversary cases against the other MCAs followed shortly thereafter.

Amidst all this, in May 2022, LCF moved to convert the case from Chapter 11 to Chapter 7. The motion, among other things, raised serious conflicts of interest by Debtor's counsel.

This, naturally, invited additional finger pointing. Various interested parties weighed in on all sides of these issues.

The hearing on the motion to convert was originally scheduled for August 11 but was pushed half a dozen times and was ultimately held on September 28. Five conferences were held between June and August to address various matters, including discovery disputes and newly discovered evidence. The Court has a transcript of one of these conferences, during which the Bankruptcy Court addressed discovery disputes relevant to the motion to convert.

In mid-August, counsel for LCF contacted Debtor's counsel about the inaccurate schedules and their intention to file a motion for an expedited hearing on the motion to convert. Two days later, the Debtor amended its statement of financial affairs (for a second time). The day after that, LCF moved for an expedited hearing and an order to show cause why the motion to convert should not be granted. The Bankruptcy Court responded by scheduling the hearing and ordering Appellants Kaur and Singh to appear, noting "the Hearing may be an evidentiary hearing."

Throughout the summer and fall of 2022, the parties tried to engage the Bankruptcy Court, as they do this Court, on the issue of which party was more derelict in turning over required discovery. The number of discovery dispute letters submitted to the Bankruptcy Court was egregious. Suffice it to say: Judge Mazer-Marino has more patience for nonsense than this Court does.

At the conversion hearing, the Bankruptcy Court, although acknowledging the ongoing disputes, did not dive deeply into those waters in its decision on the motion to convert. In an 18-page bench ruling, the Bankruptcy Court concluded there was cause to convert the case to Chapter 7. There were three main bases for the Bankruptcy Court's determination.

First, the Debtor's required schedules and statement of financial affairs were materially inaccurate, misleading, and incomplete. The Bankruptcy Court went through a detailed comparison of the original schedules and the amended schedules filed six months later, once discovery and the creditors unveiled various inaccuracies. For example, the Bankruptcy Court noted that in the original statement of financial affairs, the Debtor identified twelve ninety-day transfers comprising a $430,000 payment to Key Food and eleven other payments to the MCAs amounting to about $1.5 million. No transfers to insiders were disclosed in the original statement. But in the amended schedules, the ninety-day transfers were listed as over $12 million to forty-four different entities; the Key Food payment was increased to over $1.5 million; the MCA payments were increased to over $6.7 million; and the amended schedules added a $2 million SBA loan and insider transfers of nearly $3.7 million, $1.5 million of which was transferred to the father of the Debtor's principal (Appellant here).

Even the amended schedules were inaccurate; among other things, they characterized the insider transfers as of benefit to the Debtor, but in fact, of the nearly $3.7 million transferred to insiders, at least $1.2 million "could not have benefitted the debtor." The amended schedules were also misleading, the Bankruptcy Court explained, because they list the union's benefit claims as "unknown" notwithstanding that detailed proof of claims were filed almost two months prior to the filing of the amended schedules. The Court noted that the aggregate claims against the Debtor were in excess of $12 million (not including the MCAs' claims) and that the Debtor's failure to accurately disclose these claims and transfers was sufficient cause to convert the case.

In doing so, the Bankruptcy Court was skeptical of the Debtor's claim that these misstatements and omissions were "mistakes," noting that the eligibility cap for Subchapter V is $7.5 million. The Court held that

> [t]he inferences to be drawn are that the debtor's mismanagement was unable to determine the amounts owed to creditors as of the petition date, when the schedules were filed or shortly thereafter which means a level of incompetence in debtor's management.  Alternatively, the inference to be drawn is that the failure to list the amounts owed was an attempt to circumvent the Subchapter V eligibility requirements which means debtor's management or its professionals aren't trustworthy.

The Court noted that the time to object to the Debtor's Subchapter V designation expired before the Debtor filed amended schedules revealing debts far in excess of $7.5 million and that it would be anomalous for "debtors that file misleading or incomplete schedules [to be] rewarded with the ability to remain in Subchapter V, while debtors that file complete and accurate schedules are imperiled with objections to [Subchapter V] eligibility."

Second, the Bankruptcy Court accepted the argument of the United States Trustee that the inability of the Debtor to retain conflict-free Chapter 11 counsel, and the skullduggery shown by the Debtor's attempt to cover up that its chosen counsel (White and Williams LLP) had a conflict, also warranted conversion.  Specifically, the U.S. Trustee noted that W&W may have received a fraudulent transfer when the Debtor transferred over $1 million to its principal (one of the Appellants here), who then used $150,000 of that money to pay W&W's retainer.  W&W's retention application was inaccurate with respect to who paid the retainer and was not corrected until the eve of the conversion hearing.  Nor did W&W disclose their representation of the Debtor's affiliates, which continued well past the petition date.  Although the Debtor withdrew its application to retain W&W, it did not do so until the day before the conversion hearing, and at the hearing, W&W indicated that it would be submitting an application to be retained as special counsel.  The Bankruptcy Court found that the attempt to push through the conflicted retention was indicative of bad faith.  It held:

6

> The determination to retain new Counsel is appropriate, but the delay in reaching that conclusion until the day before the hearing on the motion to convert is suspect especially since White and Williams knew the source of its retainer, knew that it represented affiliate entities, was aware of the objections to its retainer and the likelihood that it might not be able to be retained as debtor's Counsel.

Finally, the Bankruptcy Court rejected the Debtor's arguments that there were "unusual circumstances" in the case such that conversion was not in the best interest of the creditors and the estate. See 11 U.S.C. § 1112(b)(2). The Debtor claimed that a Chapter 7 Trustee would not efficiently or effectively prosecute its fraud and civil RICO claims against the MCAs. The Bankruptcy Court disagreed, trusting that the U.S. Trustee would appoint a Chapter 7 trustee experienced in handling complex litigation. The Bankruptcy Court also rejected the Debtor's claim that conversion was not in the best interest of the creditors because the Debtor had already resolved various claims with creditors, noting that a Chapter 7 Trustee could reach the same settlements. Finally, the Court expressed skepticism that proceeding under Subchapter V would save creditors money because the proposed plan required paying a liquidating trustee and their professionals, just like the estate would have to pay for a Chapter 7 trustee and their professionals under Chapter 7. Even if that were not the case, the Bankruptcy Court held, it could not countenance continuing the Debtor-in-possession where there was "no reasonable justification for the material omissions in the schedules and statements of financial affairs."

## DISCUSSION

This Court has jurisdiction over the Bankruptcy Court's conversion order pursuant to 28 U.S.C. § 158(a). See In re Flor, 79 F.3d 281, 283 (2d Cir. 1996). A bankruptcy court's decision to grant a motion to convert a Chapter 11 case to Chapter 7 is reviewed under an abuse of discretion standard. See In re Lynch, 795 F. App'x 57, 59 (2d Cir. 2020). A bankruptcy court abuses its discretion if its decision is based "on an erroneous view of the law or clearly erroneous

factual findings," or where it "commits a clear error of judgment based on all the appropriate factors." Id. at 59 (cleaned up).

Under 11 U.S.C. § 1112(b)(1), a bankruptcy court may convert a case from Chapter 11 to Chapter 7 "for cause" if it is "in the best interests of creditors and the estate." Section 1112(b)(4) supplies a non-exhaustive list of acts or omissions that might constitute cause, including "unexcused failure to satisfy any filing or reporting requirements" and "gross mismanagement of the estate." Though not listed, it is well-established that when a debtor files or administers a Chapter 11 proceeding in bad faith, that constitutes "cause." See In re C–TC 9th Avenue Partnership, 113 F.3d 1304, 1310 (2d Cir. 1997).

Applying these standards, I cannot find that the Bankruptcy Court abused its discretion in converting the Debtor's case. Whether viewed alone or collectively, each of the reasons stated by the Bankruptcy Court constituted adequate grounds to convert.

First, the schedules the Debtor filed when it commenced the case were not just off – they were way off. It is hard to imagine how Appellant Singh, as principal of the Debtor, could have transferred $1.5 million to his father less than two months before the petition and then sign a schedule under penalty of perjury saying that there had been no payments to insiders within one year of the filing. That is not something that two people running a small business would forget, and that's not even mentioning the millions of dollars in transfers to Appellants' other entities. These insider transfers were not disclosed in the amended schedules until they were uncovered during discovery. Although the Bankruptcy Court did not expressly find that Appellants intended to defraud creditors, it did find that it could not trust the Debtor to remain in possession of the estate. The schedules and statements of financial affairs supplied plenty of evidence for that conclusion.

8

A similar attempt at bamboozling was strongly suggested by the Debtor's prolonged attempt to retain W&W as counsel. That firm's conflicts were unmistakable. There is no way a law firm that received money from principals of the Debtor, which had been transferred from the Debtor, could be expected to pursue the Debtor's avoidance claims against those same principals.

For the same reason, the Debtor's argument that it (or its liquidating trustee) would get a better result for creditors from the lender liability claims was well within the Bankruptcy Court's discretion to reject. The now-appointed Chapter 7 Trustee has no reason not to pursue any viable lender liability claims against the MCAs. And there is every reason to believe the Chapter 7 Trustee would be more aggressive in pursuing claims against Appellants, their parents, and their operating and non-operating affiliates, all of whom received substantial transfers from the Debtor at Appellants' direction.[1]

Appellants claim the Bankruptcy Court abused its discretion in deciding the motion to convert without the benefit of full discovery from LCF. They claim that without this discovery, they were hamstrung in their efforts to defend against the motion to convert. This Court cannot conceive of a document that might be in LCF's possession that would disprove any of the above findings. The discovery the Bankruptcy Court ordered LCF and Cobalt (another MCA) to turn over at the July discovery conference was, in my view, completely irrelevant to the motion to convert. Evidence that the MCAs knew about insider transfers is irrelevant to whether Appellants acted in bad faith when they filed materially inaccurate schedules. Appellants were

---

[1] I reject the argument that Appellants have no standing to pursue this appeal. It is true that only the Chapter 7 Trustee can assert the interest of the estate, but Appellants, as equity holders, have sufficient interest to confer standing.

explicitly ordered to attend the hearing and could have testified to explain their grossly inaccurate schedules. They chose not to.

Also meritless is Appellants' claim that the Bankruptcy Court looked beyond the agreed-upon "universe of documents" in ruling on the motion to convert. Appellants' own sworn statements and the representations of their counsel provide ample support for the above findings.

Finally, Appellants argue that the Bankruptcy Court abused its discretion in converting because confirmation of the Debtor's proposed plan was imminent. But Judge Mazer-Marino carefully considered that issue and, based on the totality of the circumstances, fairly disagreed. Indeed, she mentioned it as weighing against conversion right before adjourning the hearing to consider her decision: "[T]his case Is very problematic. The disclosure, the retention is very problematic clearly, clearly. On the other hand, we have a plan that really could, you know, be confirmed at least in theory."

The exception in § 1112(b)(2) requires both: (1) a finding of "unusual circumstances establishing that converting . . . the case is not in the best interests of creditors and the estate," **and** (2) that "the debtor . . . establishes [] there is a reasonable likelihood that a plan will be confirmed" within a reasonable time. The Bankruptcy Court could not find that (1) was satisfied because, among other things, a liquidating trustee would have to be paid just like a Chapter 7 trustee, and a Chapter 7 Trustee would likely be more aggressive in pursuing claims against Appellants and other insiders. The pre-ruling exchanges at the September hearing also suggest issues at prong (2) – i.e., issues of the union getting paid and whether Key Food was a co-employer. The Chapter 7 Trustee, appearing as *amicus curiae* in this appeal, has raised additional barriers to confirmation. If not the most compelling, certainly the most problematic (functionally and ethically) is that the settlement agreement reached between Key Food and the

10

Debtor included a promise that Key Food would withdraw its objection to W&W's retention due to ethical concerns. The proposed plan also compelled the liquidating trustee to retain White and Williams to prosecute the MCA claims under a 40% contingency agreement. In other words, the conflict issues discussed above were all bound up with the proposed plan, so rather than wasting resources to work those out, it made sense to scrap the proposed plan and appoint a disinterested fiduciary.

## CONCLUSION

The Bankruptcy Court acted well within its discretion in granting LCF's motion to convert the case. Its Order is therefore AFFFIRMED.

**SO ORDERED.**

                                                                       s/Brian M. Cogan

                                                                           U.S.D.J.

Dated: Brooklyn, New York
       September 21, 2023